United States Courts
Southern District of Texas
FILED

JUN 27 2018

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Criminal No. H-18-CR-350 |
| § | |
| JAMES BUCKINGHAM and § | |
| TERRY BRICKMAN, § | |
| Defendants. § | |

## INFORMATION

The United States Attorney for the Southern District of Texas charges:

### General Allegations

At all times material to this Information, unless otherwise specified:

### Commercial Insurance Plans and Pharmacy Benefit Managers

1. Commercial insurance companies, employers, and private entities offered drug plans, which were also administered and operated by Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.

2. A beneficiary in a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

3. A pharmacy could participate in a privately insured drug plan by entering into an agreement with one or more PBMs acting on behalf of a privately insured plan. When a privately insured beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim to a PBM that represented that beneficiary's privately insured drug plan. The plan or PBM then adjudicated the claim, that is, determined whether the pharmacy was entitled to payment for each claim. If the pharmacy was entitled to payment, the PBM then reimbursed the pharmacy. The

1

drug plan's sponsor, in turn, reimbursed the PBM for its payment to the pharmacy made on behalf of that drug plan.

4. Express Scripts, Inc. ("ESI"); Argus; Caremark LLC, doing business as ("d/b/a") CVS/Caremark ("CVS/Caremark"); Optum RX, Inc.; Catamaran; and Prime Therapeutics, LLC, among others, were PBMs, and were health care benefit programs, as defined by Title 18, United States Code, Section 24(b), that affected commerce.

### Compounded Drugs

5. Compounded pharmaceuticals were drugs that were combined, mixed, or altered from other drugs by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians, physicians' assistants, and nurse practitioners ("prescribers"), to meet the specific needs of individual patients.

6. Although ingredients in compounded medications were generally approved by the United States Food and Drug Administration ("FDA"), the compounded form of those medications were not. That is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

### The Defendants, Entities, and Relevant Individuals

7. Defendant **JAMES BUCKINGHAM** ("BUCKINGHAM"), a resident of North Royalton, Ohio was a pharmaceutical sales representative. In or around 2014 **BUCKINGHAM** formed Innovations in Medicine, LLC.

8. Defendant **TERRY BRICKMAN** ("BRICKMAN"), a resident of Birmingham, Michigan, was a pharmaceutical sales representative.

9. Owner 1, a resident of Dallas, Texas, owned or controlled several licensed pharmacies and related business entities in or around Houston, Texas, within the Southern District

2

of Texas.

10. Physician 1, a resident of Houston, Texas, was a physician licensed to practice medicine in the State of Texas. Physician 1, Owner 1, and their business partners, owned or controlled several licensed pharmacies and other business entities in or around Houston, Texas, within the Southern District of Texas.

11. Physician 2, a resident of Texas, was a physician licensed to practice medicine in the State of Texas.

## COUNT ONE

### Conspiracy to Commit Healthcare Fraud
### (18 U.S.C. § 1349)

12. The allegations in paragraphs 1 through 11 of this Information are realleged and incorporated by reference as though fully set forth herein.

13. Between in or around 2013 and continuing through in or around 2017, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**JAMES BUCKINGHAM and**
**TERRY BRICKMAN**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown, including Owner 1 and Physicians 1 and 2, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program in

connection with the delivery of an payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

14. It was a purpose of the conspiracy for defendants **JAMES BUCKINGHAM** and **TERRY BRICKMAN** and their coconspirators to unlawfully enrich themselves by, among other things: (1) submitting and causing to be submitted false and fraudulent claims to health care benefit programs for compounded drugs that were often medically unnecessary, based on invalid prescriptions, or never provided; (2) concealing the submission of false and fraudulent claims to a health care benefit program and the receipt and transfer of proceeds from the fraud; and (3) diverting the proceeds of the fraud for their personal use and benefit, and the personal use and benefit of their coconspirators, in the form of compensation, commission payments, and other remuneration.

## Manner and Means of the Conspiracy

The manner and means by which the defendants **JAMES BUCKINGHAM** and **TERRY BRICKMAN** and their coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

15. Between in or around 2012 and in or around 2017, Owner 1 partnered with Physician 1 and others to found, own, and operate several mail-order compounding pharmacies (collectively "the Pharmacies") in or around Houston, Texas.

16. To maximize reimbursement from health care benefit programs, the Pharmacies formulated compounded drugs, including pain, scar, and eczema creams, not based on individualized patient need, but instead based on predetermined formulas designed to maximize reimbursements from health care benefit programs.

4

17. The Pharmacies created a series of preprinted prescription forms with the Pharmacies' offerings that Owner 1 distributed to **BUCKINGHAM**, **BRICKMAN**, and other sales representatives to enable the prescribers to easily prescribe the expensive compounded drugs.

18. Owner 1 hired **BUCKINGHAM** and **BRICKMAN** as sales representatives to market the expensive compounded drugs to prescribers and customers in exchange for a commission—a percentage of the reimbursements that health care benefit programs paid for the compounded drugs.

19. To maximize their commission payments, **BUCKINGHAM** and **BRICKMAN** signed up themselves and their families, some of whom unwittingly, to receive expensive compounded drugs, including pain cream and scar cream, as well as supplements that they did not need and often did not use.

20. Knowing he would be paid a commission based on reimbursements for filled prescriptions for compounded drugs he referred to the Pharmacies, **BUCKINGHAM** solicited friends and acquaintances to receive compounded drugs. In exchange for agreeing to provide their insurance information and to accept monthly deliveries of unnecessary compounded drugs, **BUCKINGHAM** offered to pay, and paid, his friends and acquaintances up to approximately $1,000 in cash each month. As a further inducement, the Pharmacies routinely waived copayments for the individuals **BUCKINGHAM** referred to the Pharmacies for compounded drugs.

21. Knowing he would be paid a commission based on reimbursements for filled prescriptions for compounded drugs he referred to the Pharmacies, **BRICKMAN** solicited friends and acquaintances—some of whom resided in other states—to receive compounded drugs. Owner 1 often paid **BRICKMAN**'s friends and acquaintances in exchange for their providing their insurance information and for agreeing to receive monthly deliveries of unnecessary compounded

drugs. As a further inducement, the Pharmacies routinely waived copayments for the individuals **BRICKMAN** referred to the Pharmacies for compounded drugs.

22. Physicians 1 and 2 purportedly prescribed the expensive compounded drugs, including pain and scar cream, and supplements, to the family, friends, and acquaintances that **BUCKINGHAM** and **BRICKMAN** referred to the Pharmacies. Although Physicians 1 and 2 purportedly prescribed the expensive compounded drugs, neither **BUCKINGHAM** and his family—who resided in Ohio—nor **BRICKMAN** and his wife—who resided in Michigan—nor many of the friends and acquaintances they referred—who lived in Ohio, Massachusetts, and other states—were patients of, or treated by, either Physician 1 or 2, who resided in Texas and were both unlicensed in Ohio and Michigan. Those prescriptions for the expensive compounded drugs were thus invalid and almost always medically unnecessary.

23. The PBMs occasionally audited the Pharmacies, the prescribers, and the patients who had purportedly been prescribed these expensive compounded drugs. **BUCKINGHAM**, **BRICKMAN**, Owner 1, Physician 1, and others conspired to provide false information to the PBMs to make it appear as if the prescriptions for compounded drugs reimbursed by the PBMs were medically necessary, based on a valid prescription, dispensed to the insurance beneficiaries, and that copayments were properly collected.

24. The PBMs and, by extension, the health care benefit programs, relied upon the representations that **BUCKINGHAM, BRICKMAN**, Physician 1, Physician 2, Owner 1, and others made that the drugs dispensed were based on a valid prescription, were medically necessary, and that copayments were properly collected.

25. Between in or around early 2014 and in or around early 2016, the PBMs, in reliance on those false representations, reimbursed the Pharmacies approximately $5.2 million for

compounded drugs it dispensed to **BUCKINGHAM**, his family, friends and acquaintances, which Physician 1 and 2 purportedly prescribed to patients neither physician had seen or treated. Owner 1 paid **BUCKINGHAM** approximately $414,000 in commission payments for those filled, unnecessary, prescriptions.

26. Between in or around early 2014 and in or around early 2016, the PBMs, in reliance on those false representations, reimbursed the Pharmacies approximately $850,000 for compounded drugs they dispensed to **BRICKMAN**, his wife, and his friends and acquaintances, which Physicians 1 and 2 purportedly prescribed to patients neither physician had seen or treated. Owner 1 paid **BRICKMAN** approximately $290,000 in commission payments for those filled, unnecessary, prescriptions.

All in violation of Title 18, United States Code, Section 1349.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendants **JAMES BUCKINGHAM** and **TERRY BRICKMAN** that, upon conviction of Count One, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

(CONTINUED ON NEXT PAGE)

## Money Judgment and Substitute Assets

Defendants **JAMES BUCKINGHAM** and **TERRY BRICKMAN** are notified that upon conviction, a money judgment may be imposed against each defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant up to the amount of the money judgment.

RYAN K. PATRICK
UNITED STATES ATTORNEY

*/s/ Aleza Remis*
ALEZA REMIS
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1000 Louisiana, St. 2300
Houston, Texas 77002
Aleza.remis@usdoj.gov
(713) 567-9406